Eric FOX, Appellant

v.

Christopher Bryan NAGLE, Appellee.

No. CA 10–793.

Court of Appeals of Arkansas.

March 2, 2011.

Rehearing Denied April 13, 2011.

Robert R. Cortinez II, Little Rock, for appellant.

Meridith Miller Wineland, Benton, for appellee.

DOUG MARTIN, Judge.

Appellant Eric Fox appeals the decision of the Saline County Circuit Court finding that his consent was not required to the adoption of his natural son, B.F., by appellee Christopher Nagle, the child's stepfather. Because we conclude that the circuit court erred in finding that Fox failed significantly to communicate with the child, we reverse and remand.

Fox is the natural father of B.F., who was born to Eric and Stephanie Jeffrey (now Stephanie Nagle) on September 9, 2002. Stephanie married her husband, appellee Christopher Nagle, on December 14, 2007, and Christopher filed a petition to adopt B.F. on August 7, 2009. Eric filed a response to the petition in August 2009 and a motion to dismiss the petition on March 26, 2010. In his motion to dismiss and accompanying brief, Eric asserted his refusal to consent to the adoption of B.F. In response, Stephanie and ₂Christopher argued that Eric's consent was unnecessary because Eric had failed significantly and without justifiable cause to communicate with the child or to provide for the care and support of the child as required by law or judicial decree. *See* Ark.Code Ann. § 9–9–207(A)(2) (Repl.2009).

The circuit court held a hearing on the petition for adoption on April 7, 2010. The court first considered the question of whether Eric's consent to the adoption was required. After hearing testimony from Stephanie, Christopher, and Eric, the court determined that Eric's consent was not required because Eric had failed to communicate with the child. The court then addressed whether it was in the best interest of the child to allow the adoption to proceed and, after taking additional testimony from each side, concluded that it was. The final decree of adoption was entered on April 23, 2010, and Eric filed a timely notice of appeal on May 7, 2010.

Adoption proceedings are reviewed de novo. *In re Adoption of S.C.D.*, 358 Ark. 51, 186 S.W.3d 225 (2004); *A.R. v.*

*Brown,* 103 Ark.App. 1, 285 S.W.3d 716 (2008). Adoption statutes are strictly construed, and a person wishing to adopt a child without the consent of a parent must prove that consent is unnecessary by clear and convincing evidence. *A.R. v. Brown, supra* (citing *In re Adoption of Lybrand,* 329 Ark. 163, 946 S.W.2d 946 (1997)). There is a heavy burden placed upon the party seeking to adopt a child without the consent of a natural parent to prove the failure to communicate or the failure to support by clear and convincing evidence. *Racine v. Nelson,* 2011 Ark. 50, 378 S.W.3d 93. A circuit court's finding that consent is unnecessary due to failure to support or communicate with the child will not be reversed unless clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* We give due regard to the opportunity and superior position of the trial judge to determine the credibility of witnesses, and we have stated that the personal observations of the trial judge are entitled to even more weight in cases involving the welfare of a small child. *Vier v. Hart,* 62 Ark.App. 89, 968 S.W.2d 657 (1998).

At issue in this appeal is whether Eric's consent to the adoption was required. The relevant statute is Arkansas Code Annotated section 9–9–207(a)(2) (Repl.2009), which provides as follows:

> (a) Consent to adoption is not required of:
>
> . . . .
>
> (2) a parent of a child in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to

communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree[.]

The one-year period set out in the statute may be any one-year period, not merely the one-year period preceding the filing of the adoption petition. *In re Adoption of Lybrand,* 329 Ark. 163, 946 S.W.2d 946 (citing *Pender v. McKee,* 266 Ark. 18, 582 S.W.2d 929 (1979)).[1]

It is not required that a parent fail "totally" in these obligations in order to fail "significantly" within the meaning of the statutes. *Neel v. Harrison,* 93 Ark. App. 424, 220 S.W.3d 251 (2005). It denotes a failure that is meaningful or important. *Id.; Pender v. McKee,* 266 Ark. 18, 582 S.W.2d 929 (1979). Therefore, the question on appeal is narrowed to whether Eric's failure was without justifiable cause, which has been interpreted as "intentional" or "willful." *Neel,* 93 Ark.App. at 428, 220 S.W.3d at 254 (citing *Manuel v. McCorkle,* 24 Ark.App. 92, 749 S.W.2d 341 (1988)); *see also In re Adoption of Lybrand,* 329 Ark. at 169, 946 S.W.2d at 950 (holding that a failure to communicate without justifiable cause is "one that is 'voluntary, willful, arbitrary, *and* without adequate excuse'") (quoting *In re Adoption of K.F.H. and K.F.H.,* 311 Ark. 416, 421, 844 S.W.2d 343, 346 (1993)).

In the present case, as noted, the circuit court found that Eric's consent was not required because he had failed significantly to communicate with his son during the year at issue. On appeal, Eric argues that he had "ample personal visits" and "ample telephone calls or attempted telephone calls" with B.F., that Stephanie and Christopher thwarted his attempts to communi-

---

1. In the present case, however, the parties agreed to limit the one-year period to the year preceding the filing of the petition for adop-

tion—that is, from August 8, 2008, until August 8, 2009.

cate with and support the child, and that any limitations on his communications were based upon justifiable cause.

At the hearing before the circuit court, Christopher testified that he married Stephanie on December 14, 2007, and that B.F. had lived with them the entire time since. Christopher, a pharmacist earning about $125,000 per year, testified that he and Stephanie had another child, who was five weeks old at the time of the hearing. When asked to recount how many times he knew of that Eric had seen B.F. in the year prior to the filing of the adoption petition, Christopher recalled five occasions:

- September 9, 2008: on B.F.'s birthday, Eric came to Christopher and Stephanie's house and stayed for "about an hour";
- Christmas 2008: Stephanie took B.F. to Eric's house for forty-five minutes to an hour to open Christmas presents;
- March 2009: Eric brought B.F. a four-wheeler to Christopher and Stephanie's house and spent about fifteen to thirty minutes with B.F.;
- April 9, 2009: B.F. broke his arm in a playground fall, and Eric came to the doctor's office for thirty minutes to an hour; and
- April 25, 2009: Eric took B.F. to a wedding and spent approximately thirty minutes before returning B.F. to Christopher and Stephanie's house.

Totaling the number of hours Eric had seen B.F. over the previous year, Christopher estimated four-and-a-half to five hours.

On cross-examination, Christopher acknowledged that Eric had made "ten [or] twelve" phone calls to try to talk to B.F. during the year at issue. Christopher testified that Eric's visitation with B.F. was supposed to be supervised by Stephanie and contended that Stephanie allowed visitation every time Eric called, except for instances where he would call on such short notice that Christopher and Stephanie already had plans. Other than the two times that Eric came to the house to see B.F., Christopher testified that he did not recall Eric requesting additional visitation with B.F. Christopher subsequently conceded, however, that B.F. went to a birthday party with Eric in October 2008 and spent a few hours with Eric and his parents on that occasion.

Stephanie testified next, stating that she kept track of Eric's calls in a day planner, and there were times when Eric would not call for six or seven weeks. She agreed with Christopher that Eric had seen B.F. on five occasions during the year preceding the adoption petition. Stephanie further testified that she had pulled eighteen months of records from the phone company and looked through them to see how often Eric called to make contact with B.F. Stephanie testified that, when Eric wanted to do something with B.F., he would call, but "in between then, it was very rare that he would call just to talk to him."

Stephanie denied that she ever refused to allow Eric to visit B.F., explaining that, for example, once when Eric's mother called to see if she could take B.F. to a family funeral, Stephanie and Christopher were on vacation and did not receive the message until they returned home. Another time, before the one-year period preceding the adoption petition, Eric called to say that he had broken his arm in a skateboarding accident and wanted B.F. to be brought to the hospital, but Stephanie and Christopher were in Memphis. On another occasion, Stephanie testified, Eric made plans to come over and watch a movie with B.F., but he called about thirty minutes

before he was supposed to be there and said he could not make it. Stephanie testified that Eric never called to reschedule.

Summarizing the contacts and the relationship between Eric and B.F., Stephanie testified that Eric had not "had much contact at all," and the last time Eric had seen B.F. had been in April 2009. Stephanie testified that the phone records indicated that Eric had called three times since May 2008. She further testified that, after the adoption petition was filed, Eric called the house once, but the call was made at 10:30 on a Wednesday morning, when B.F. was in school.

On cross-examination, Stephanie agreed that, prior to May 2009, when Christopher and Eric got into an argument, there had not been any problems with the visitation schedule. She denied, however, that the adoption petition was filed because of that argument, stating instead that she and her husband filed the petition when they discovered Stephanie was pregnant. When asked if she had been "withholding" visitation after the May 2009 argument, Stephanie testified that Eric never asked to visit after that time. When asked if there had been any other face-to-face visits between Eric and B.F. in the year before the adoption petition had been filed, Stephanie acknowledged that there might have been at least two other visits, but she denied that she had refused to allow Eric to have visitation since the filing of the petition, reiterating that Eric never requested visitation. She agreed, however, that she would not have allowed visitation if she had known Eric was requesting it.

Stephanie testified that, between August 2008 and August 2009, Eric called nineteen times. Of those phone calls, seven were placed at a time when B.F. was either in school or in bed, so Eric could not have communicated with his son on those occasions. The remaining twelve phone calls ranged from one to fifteen minutes, but Eric did not ask for additional visitation with B.F. during each of those calls.

Eric was called to testify next. He stated that he was ordered to pay child support for B.F. and that he sent the payments directly to Stephanie. On August 23, 2009, Eric sent Stephanie a check for child support that was owed from December 15, 2008, to August 23, 2009. During that time frame—December 2008 to August 2009—he conceded that he did not pay any child support to Stephanie. Prior to that time, he would give his parents money for them to write Stephanie a check; the payments came sporadically and never in the same amount. When asked whether he had been ordered to pay $35 per week, Eric said that the original paternity order directed him to pay that much, but it was later changed to 15 percent of his weekly earnings. He testified that, during those times when he was not working, he would give Stephanie the $35 each week.

On cross-examination, Eric explained that he had his parents write Stephanie a check because he did not have a checking account and wanted to have proof that the child support had been paid. He further testified that he had a skateboarding injury sometime between the end of 2008 and the beginning of 2009 and could not work as a Sheetrock installer for some time after that. He said that Stephanie knew that he was having problems with employment and making his child-support payments, and she did not ask him to make payments during that time. Eric was involved in a car wreck in May 2009, as well, and was thus unemployed for approximately eight months of the year preceding the filing of the adoption petition. When he received notice of the filing of the petition, however, Eric made arrangements at that

point to pay the eight months of back-due child support.

Eric further asserted that he had been current on his child-support payments from August 2008 until December 2008 and that Stephanie had never voiced an objection to the times when he was late with the payments. He claimed that, if he had not been injured, he would have continued to make his child-support payments after December 2008.

Christopher and Stephanie's counsel concluded their case, and Eric was recalled to the stand. Eric testified that he and his family had always had to initiate contact with B.F. and that Stephanie had never tried to contact him. After Stephanie and Christopher were married in December 2007, Eric said that he "didn't want to stir up a bunch of stuff" regarding visitation, although he attempted to maintain contact with B.F. by calling about once a week, even though he was unable to get through to B.F. each time. He said that he would approach visitation by calling and trying to see his son, and if Stephanie and Christopher allowed it, he would see B.F.

Eric introduced photographs of him and B.F. taken at a family reunion, which he said occurred in August 2008; he described the event as lasting "just about all day." [2] Eric testified that, in September 2008, Stephanie brought B.F. over on his birthday, and they spent about thirty minutes together. About a week later, Eric testified that he went to B.F.'s house and "spent hours" building an erector set with his son. Although he did not recall going over to the house any other times in September 2008, he said that he knew he had called "every month for sure." In October 2008, Eric took B.F. to a family party at Playtime Pizza and spent "probably three or four hours" with him. Eric did not recall talking to B.F. in November 2008, but he said that he spent "maybe thirty minutes to an hour" with B.F. on Christmas that year. In January 2009, Eric was "not exactly sure" whether he had contacted B.F., although he said that he knew that he tried to call during that month. He denied that Stephanie ever told him that he could not see his son at that time.

During the spring of 2009, Eric said that he took a four-wheeler to B.F. at Stephanie's house and watched B.F. ride around the yard for a while, perhaps for an hour. In April of that year, Eric took B.F. to a friend's wedding. He disputed Christopher's testimony that he only spent half an hour with B.F. on this occasion, saying that it was around two hours because B.F. "was there before the wedding, and I know no wedding has ever been over in thirty minutes." Between August 2008 and August 2009, Eric said that he was trying to maintain telephone contact with B.F., calling "probably a couple times every month."

In May 2009, as mentioned above, Eric was in a car wreck; while he was undergoing treatment for his injuries, his doctors found several suspicious growths and tested Eric for cancer. He testified that he called to talk to B.F. about the growths and could hear Christopher laughing about it in the background. Eric told B.F. that Christopher was "being a punk," and after the call was over, Christopher called Eric back and got into an argument with him. Eric testified that Christopher told Eric that Christopher was going to stop Eric's visitation. Testifying about his plans after this argument, Eric said,

---

**2.** On subsequent cross-examination, Eric conceded that the family reunion was probably prior to August 8, 2008. Eric's father, however-

er, testified that his credit-card receipts for the cabin rental for that reunion were dated August 14 and August 15, 2008.

Actually, I thought it would blow over, you know. I thought it was something that would just settle down and everything would be okay and you know, we would go back to talking like civil people, you know, and I would get to see him from time to time like always. And then they hit me with the adoption.

Eric was not sure if he tried to call B.F. after this point, although he believed that he texted Stephanie. Eric testified that he had no further contact with Christopher and Stephanie after that point until they filed the adoption petition.

Regarding his child-support obligation, Eric testified that Stephanie had never complained about the way Eric had sent her payments and that they both considered the way he was sending money to be "regular." Eric said that Stephanie never voiced any concerns about the child-support payments and never asked for anything extra for other bills or expenses. He explained that, after December 2008, it was not his intent to never pay her child support, and Stephanie never demanded any additional payments because she knew that there would be some weeks that he would be a little behind due to his unemployment.

On cross-examination, Eric agreed that, even including the family reunion, which may have occurred prior to August 8, 2008, and the October 2008 party at Playtime Pizza, he had been around B.F., by his own testimony, for perhaps a total of twenty to twenty-four hours during the year at issue.

At the conclusion of the testimony, the court ruled from the bench that Eric had provided substantial support, although the court qualified that finding by saying that it was "just not by much over a line of what I would call substantial." Regarding

the contact between Eric and B.F., however, the court pointed to "very important points of testimony" from Eric, stating as follows:

[Eric], by his own testimony, saw B.F.—and I think it's correct—approximately eight times during a period of one year. He at one point in time testified that he would try to call about once a week, and then later on that testimony changed to he would try to call a couple of times a month.

But the most telling statement that [Eric] made while he was on the stand—and I think for the most part that [Eric] was truthful in his testimony. The most telling thing that he said when he was on the stand was that after the argument—and you can state the argument going either way. I mean, it was an argument. It's no big deal, really. But that he thought that after a period of time that it would all go back to the way it was and he would begin to see B.F. again from time to time. That is a quote from [Eric].

In my mind, that by definition is his action in not attempting to see B.F. a substantial amount of time. When the circumstances are as they are in this situation and [Eric] has opportunities—substantial opportunities—to spend time with B.F., and substantial opportunities to repair the visitation that was removed from him for whatever reason back in '07 and he fails to take advantage of it based upon the thought process that he would see his son from time to time, he is in effect showing an intent to not follow through with visitation. Therefore, his consent is dispensed with and parental rights will be terminated.[3]

---

3. Upon questioning by counsel, the court subsequently clarified that it meant that, under Ark.Code Ann. § 9–9–207(a)(2), Eric's con- sent to the adoption was not required. The court noted that the termination of Eric's

On appeal, Eric argues that the trial court erred in finding that he "failed significantly without justifiable cause ... to communicate with the child" for the one-year period preceding the filing of the adoption petition. *See* Ark.Code Ann. § 9–9–207(a)(2)(i). As mentioned above, the supreme court has noted that the phrase "failed significantly" does not mean "failed totally." *Pender v. McKee,* 266 Ark. 18, 28, 582 S.W.2d 929, 934. It "denotes a failure that is meaningful or important." *Id.* As noted above, a "failure to communicate ₁₃without justifiable cause" is "one that is 'voluntary, willful, arbitrary, and without adequate excuse.'" *In re Adoption of Lybrand,* 329 Ark. 163, 169–70, 946 S.W.2d 946, 950.

Eric argues that he attempted to see his son many times and did not ask for more visitation only because he was "concerned about disrupting" Christopher and Stephanie's recent marriage. In addition, he cites his two injuries as justification for his failure to pay support for large periods of time during the one-year period preceding the adoption petition.[4] Finally, Eric argues that Christopher and Stephanie thwarted his access to and communication with B.F., pointing to his own testimony that he would see B.F. "whenever 'they' would allow it." Thus, Eric argues that, because he did not fail significantly without justifiable cause to communicate with B.F., the circuit court erred in finding that his consent to the adoption was not necessary.

We agree. Based on the evidence presented below, we simply cannot say that Eric failed "significantly" and "without justifiable cause" to communicate with his son. Over the course of the one-year period, Eric saw his son on numerous occasions. This is not a case like *Apel v. Cummings,* 76 Ark.App. 93, 61 S.W.3d 214 (2001), in which the father did "little more than reluctantly send court-ordered child-support payments and insurance premiums since the time of his divorce from [the children's] mother" and failed to see the children or make an effort to do so for over a year and a half. *Apel,* 76 Ark.App. at 98, 61 S.W.3d at ₁₄218. Rather, we conclude that Eric made efforts during the year to see B.F., including taking him to a family reunion[5] and bringing him to a family birthday party. Such ongoing efforts do not constitute a significant failure to communicate, and we hold that the trial court erred in so finding.

In reaching this conclusion, we are mindful of the supreme court's declaration in *In re Adoption of Glover,* 288 Ark. 59, 702 S.W.2d 12 (1986):

> [T]he law is solicitous toward maintaining the integrity of the natural relation of parent and child; and in adversary proceedings in adoption, where the absolute severance of that relation is sought, without the consent and against the protest of the parent, the inclination of the courts, as the law contemplates it should be, is in favor of maintaining the natural relation.

parental rights would not be accomplished until the adoption was granted.

4. As the trial court found that Eric had provided adequate support, albeit barely, we do not address this argument herein; the issue on appeal is Eric's failure to communicate with the child under § 9–9–207(a)(2)(i), not a failure to support under § 9–9–207(a)(2)(ii).

5. We note that there was testimony to the effect that Eric intended to keep B.F. at the reunion for two days, but Stephanie decided that it would not be a good idea and had B.F. returned home.

*Glover*, 288 Ark. at 62, 702 S.W.2d at 13–14. Because we conclude that the trial court clearly erred in finding that Eric's consent to the adoption was unnecessary, we reverse and remand. Our holding renders moot Eric's second argument that the trial court erred in finding that the adoption was in B.F.'s best interest.

Reversed and remanded.

VAUGHT, C.J., and GLADWIN, J., agree.