2014 Ark. App. 268

**Rhonda DUCHARME, Appellant**

v.

**Larry GREGORY and Jo Lynn Gregory, Appellees.**

**No. CV–13–827.**

Court of Appeals of Arkansas.

April 30, 2014.

15

W. Marshall Prettyman, Legal Aid of Arkansas, for appellant.

Brenda Horn Austin, for appellees.

LARRY D. VAUGHT, Judge.

Rhonda Ducharme appeals the grant of Jo Lynn and Larry Gregory's petition to adopt HD, Rhonda's biological daughter. She argues on appeal that the trial court erred in finding that her consent to adoption was not required under Ark.Code Ann. § 9–9–220 (Repl.2009). Specifically, Rhonda argues that the circuit court erred in finding that she had failed—significantly without justifiable cause—to support HD for at least one year and that HD had been subjected to ongoing abuse and neglect that was irremediable. While we find merit in portions of Rhonda's appeal, we ultimately affirm the court's decision to grant the Gregorys' petition to adopt HD.

There was evidence introduced at the adoption hearing to support the follow-

ing statements of fact. On October 25, 1999, HD was born to Rhonda, who at the time was unmarried and single. The natural father of HD is believed to be Julio Garcia, a Cuban national living in either Clearwater or Tampa, Florida, address unknown. However, because he was neither listed on HD's birth certificate nor married to Rhonda at the time of conception and has made no attempt to legitimize the child, the consent of HD's presumptive natural father is not required for the adoption. Additionally, there have been no filings with the putative-fathers registry relating to the paternity of HD.

The Gregorys are not related to HD but were introduced into her life while Jo Lynn was serving as Rhonda's Alcoholics Anonymous (AA) sponsor. On September 9, 2005, Rhonda executed and delivered a document consenting to Jo Lynn's right to care for HD. The document specifically conveyed physical custody, authority for medical care, and discretion to direct the education of HD to the Gregorys. Over the years, the Gregorys would care for the child during periods where Rhonda was either hospitalized, incarcerated, or in treatment for issues resulting from her addiction to alcohol. On August 24, 2011, the Gregorys filed a petition to adopt HD, who also filed a consent document with the court stating that, likewise, she desired to be adopted by the Gregorys and have her name changed to Gregory.

The first hearing relating to the adoption of HD was held on April 5, 2013, where the court considered Rhonda's request for visitation with her daughter. Laurie Joyner, Rhonda's counselor, testified that Rhonda was getting help for her alcoholism and was working on improving her parenting skills. Although Joyner could not speak to Rhonda's past, she testified that Rhonda had a proactive plan for the future and was getting the help needed to recover from her alcohol addiction and the resulting harm that it had caused HD.

At the hearing, HD testified that the last night she had spent with her mother was June 19, 2011, and that on that day Rhonda "had been drinking sherry cooking wine all day." HD went on to state that she woke up that morning at 6:00 or 7:00 and fixed her (already intoxicated) mother breakfast. However, Rhonda remained on the floor and did not join HD for breakfast; she fixed her mother a "noonday" meal and fed it to her. According to HD, that evening, she fell asleep on the couch and around 9:00 p.m., Rhonda confronted her:

> She was telling me to pick up my stuff. There wasn't anything to pick up. She just kept yelling at me. She went into my room, took my clothes out of my closet, and threw them on the floor. She was saying, "Pick up your stuff." I went back in and picked up everything and put it in the closet. My mom was in the room when I did that. My mom laid her hands on me. She dragged me down the hall by my hair. She was taking me around [eighteen] feet to the back bedroom. She made it back to the bedroom ... and tried to pin me to the wall. She had my hair when she drug me to the other bedroom, and then she took my hand and had my back against the wall. She fell. I got loose....

According to HD, at her mother's request, the following morning, Jo Lynn came to pick her up. HD was present when her mom told Jo Lynn that HD was not cooperative and that Rhonda didn't know how long she could restrain herself from putting HD's head through a wall. HD also testified that Rhonda had physically abused her on at least eight other occasions and that the abuse had escalated from yelling to physical abuse.

HD testified that since she began living with the Gregorys she had spoken with her mom on the phone occasionally, but she did not want scheduled visitation with her mother because she feared for her life; but, she would consider a future relationship (as an adult) with Rhonda, if her mother remained consistently sober.

The court found that Rhonda had been an alcoholic since at least 2003 and denied the visitation request, with the caveat that the Gregorys provide HD with individual counseling and submit to criminal background checks and a home study. The court set the adoption for trial on July 19, 2013.

The court began the trial by finding that the Gregorys had raised the rebuttable presumption of neglect and abuse of HD in July 2012 and that Rhonda had failed to rebut that presumption. The court found that there had been permanent damage to the mother-daughter relationship and the cause of the harm was irremediable. This finding was based on testimony of witnesses who testified in several hearings during the pendency of the case.

First, the court relied on the testimony of Dena Fraker, who met Rhonda through AA activities in 2003 and 2004. She witnessed Rhonda drunk on several occasions during this time and observed the active role that the Gregorys played in caring for HD when Rhonda was unable to do so.

Michelle Bathon also testified that she had lived next door to Rhonda and HD for about six years between 2004 and 2009 and that she took care of HD when Rhonda was too sick from drinking "cooking sherry and other alcoholic drinks." She also testified that she transported Rhonda to the emergency room "twenty times or more" when she was ill from alcohol. Bathon further testified that she "then started calling an ambulance to come and get [Rhonda] because she feared she was making it too easy for [Rhonda] to be drunk." According to Bathon, she assisted in caring for HD when her mother would leave the child unattended for several days at a time and that Rhonda did not arrange care for HD and "just left her alone without care." Finally, Bathon testified that occasionally Rhonda would have "scary" male visitors in the apartment and that Bathon was "afraid for HD."

Next, the record shows that Laurie Beckman met Rhonda in 2010 at a dog-adoption event. Beckman allowed Rhonda and HD to move into her home that Christmas. However, while Beckman was away from home, Rhonda "stole her cooking sherry and wine and drank it all becoming very drunk on several occasions while in her home." According to Beckman, she would secrete her wine in a closet to prevent Rhonda from drinking it, but Rhonda eventually discovered it and consumed the stash. Shortly thereafter, Beckman called the police to have Rhonda removed from the home. Beckman also assisted HD with the move, because Rhonda was "too drunk" to help. Beckman also stated that, because Rhonda was either unable or unwilling to take HD to a doctor for medical treatment of a chronic intestinal problem, Beckman took on the responsibility. Finally, Beckman testified that on one occasion, after hearing "thuds, like someone hit the wall and stomping on the floor" she "went to see what was going on and observed [Rhonda] straddling HD on the bed and slapping her." The incident was reported to the Arkansas Department of Human Services.

Jo Lynn Gregory testified that on June 19, 2011, after Rhonda had been drinking and became engaged in a physical altercation with HD, Rhonda called Jo Lynn and instructed her to come and get HD "before I put her head through the wall." Jo

Lynn further stated that after the June episode, HD asked the Gregorys to adopt her and had not changed her mind since, testifying two separate times that she wished to be adopted by the Gregorys.

Sandra Allred also provided evidence relating to the adoption. According to Allred, HD was mentally healthy and did not require any therapy—making good grades, living in a good environment, where she is glad to be and wants to remain. Martha Wells, a licensed social worker and home-study specialist, reported that HD was healthy and content in her present surroundings and that the stability should be maintained.

The trial court agreed, and found that the adoption was advisable and in HD's best interest. On April 4, 2013, the court granted the adoption and ordered that HD be issued a new birth certificate reflecting Gregory as her surname. It is from this order that Rhonda now appeals. She argues that the trial court erred by allowing her biological child to be adopted by the Gregorys without her consent.

In adoption proceedings, we review the record de novo, but we will not reverse the lower court's decision unless it is clearly erroneous or against a preponderance of the evidence, after giving due regard to its superior opportunity to determine the credibility of the witnesses. *Chrisos v. Egleston,* 7 Ark.App. 82, 644 S.W.2d 326 (1983). We have said that in cases involving minor children a heavier burden is cast upon the court to utilize to the fullest extent all its power of perception in evaluating the witnesses, their testimony, and the children's best interest; that the appellate court has no such opportunity; and that we know of no case in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as one involving minor children. *In re Adoption*

*of J.L.T.,* 31 Ark.App. 85, 788 S.W.2d 494 (1990). When the issue is one of terminating parental rights, the appellate courts have referred to the "heavy burden" upon the party seeking to terminate the relationship. *Bush v. Dietz,* 284 Ark. 191, 680 S.W.2d 704 (1984). Adoption proceedings are in derogation of the natural rights of parents, and statutes permitting such are to be construed in a light favoring continuation of the rights of natural parents. *Id.* at 195, 680 S.W.2d at 708.

As adoptions were unknown to the common law, they are governed entirely by statute. *Irvan v. Kizer,* 286 Ark. 105, 689 S.W.2d 548 (1985). Our state statutes distinguish between two methods by which a child may be adopted: 1) the relinquishment of the right to consent to adoption to a third party, embodied in Arkansas Code Annotated section 9–9–220, and 2) direct consent to adoption by an individual, embodied in section 9–9–208. These two provisions are mutually exclusive, in that they address separate methods by which a child may be adopted and provide different means by which the relinquishment of consent or direct consent may be withdrawn.

Here, the trial court relied on section 9–9–220(c)(2)(B) when dispensing with Rhonda's right to consent to the adoption. This provision states that "the relationship of parent and child may be terminated by a court order" on the following grounds:

(1) Abandonment as defined in § 9–9–202(7).

(2) Neglect or abuse, when the court finds the causes are irremediable or will not be remedied by the parent.

. . . .

(B) If the parents have attempted to remedy the causes but have failed to so within twelve (12) months, and the court finds there is no reasonable likelihood

the causes will be remedied by the eighteenth month, the failures shall raise the rebuttable presumption that the causes will not be remedied.

According to our statutes, "neglect" means "the failure or refusal, including acts or omissions, of a person legally responsible for the care and maintenance of a child" including failure to provide "necessary food, clothing, shelter, and education required by law, or medical treatment necessary for the child's well-being." Ark.Code Ann. § 9–9–202(8)(a). Further, "abuse" means "any injury" that is "inflicted by a person upon a child other than by accidental means." Ark.Code Ann. § 9–9–202(10).

Unfortunately, in this case, there is more than ample evidence that for at least nine years (from 2003 until 2012) Rhonda was addicted to alcohol, and as a result HD was abused and neglected for most of her natural life. While the record suggests that Rhonda has managed to be free of alcohol dependence since February 2012, we are convinced that the damage caused to HD from nearly a decade of abuse and neglect cannot be undone by a short bridge of sobriety. HD's testimony was compelling, and she presented as an extraordinarily mature teenaged girl. She conveyed concern for her mother, coupled with fear for her own life and well-being. She expressed a desire for present-day stability but left open the door for a future, adult relationship with her mother. Based on the credible testimony of HD, which was corroborated by multiple witnesses, we cannot disagree with the trial court's conclusion that Rhonda failed to rebut the presumption that her consent to the adoption is not required based on her abuse and neglect of HD.

We do, however, take issue with the trial court's analysis and conclusions of law related to Rhonda's alleged failure to support HD for a one-year period. Specifically, the trial court's reading of *Fox v.*

*Nagle,* 2011 Ark. App. 178, 381 S.W.3d 900, is incorrect. Although not essential for the resolution of this case, we point out the trial court's error to clarify our holding. In calculating the one-year period of non-support that was required to trigger a second ground for a non-consent adoption of HD, the trial court stated that "the one-year period set out may be any one-year period, not merely the one-year period preceding the filing of the adoption." This is incorrect. The statutory period can only be any one-year period that accrues *preceding* the filing of the adoption petition. *In re Adoption of SCD,* 358 Ark. 51, 57, 186 S.W.3d 225, 228 (2004).

Therefore, we affirm the trial court's decision to grant the adoption of HD to the Gregorys without Rhonda's consent based solely on the ground that HD suffered irremediable abuse and neglect and the adoption is in her best interest.

Affirmed.

WYNNE and WHITEAKER, JJ., agree.