Cite as 2024 Ark. App. 202

# ARKANSAS COURT OF APPEALS

DIVISIONS I & II
**No.** CV-23-172

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF MINOR CHILD | **Opinion Delivered** March 13, 2024 |
| RANDELL G. SHELTON, JR. | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT |
| APPELLANT | [NO. 72PR-22-228] |
| V. | HONORABLE DOUG MARTIN, JUDGE |
| JESSE REID AND SHEENA REID | AFFIRMED |
| APPELLEES | |

## WAYMOND M. BROWN, Judge

Appellant Randell Shelton appeals from the final decree of adoption granted in the Washington County Circuit Court on November 18, 2022, in favor of appellees Jesse and Sheena Reid. On appeal, Randell argues that the circuit court erred in finding that (1) his consent to the adoption was unnecessary; and (2) that the adoption was in the minor child's (MC's) best interest. We affirm.

We review adoption proceedings de novo.[1] A circuit court's finding will not be reversed unless it is clearly erroneous or against a preponderance of the evidence, after giving due regard to its superior opportunity to determine the credibility of witnesses.[2] We give great weight to a circuit court's personal observations when the welfare of children is involved.[3]

---

[1]*Newkirk v. Hankins*, 2016 Ark. App. 186, 486 S.W.3d 827.

[2]*Navarrete v. Creech*, 2016 Ark. App. 414, 501 S.W.3d 871.
[3]*Id.*

Randell and Sheena married in November 2016 and divorced on February 5, 2020. There was one child born of the marriage. Upon divorce, Sheena was awarded custody of MC, the parties' then eighteen-month-old child. In October 2018, prior to the parties' divorce, when MC was approximately two months old, Randell was charged with numerous counts of wire fraud and mail fraud. After the trial held on April 28, 2019, Randell was convicted and sentenced to serve a six-year term of incarceration in federal prison. The parties' subsequent divorce decree contained the following provision:

> The Defendant is currently incarcerated with his case on appeal. Upon the Defendant being released from prison, whether that is pending new trial or permanent release, the Defendant shall be entitled to provide the Plaintiff with notice that he is requesting visitation and if the parties cannot agree to a visitation schedule, then either party shall have a right to request a hearing before the Court. The Plaintiff waives the right of personal service as to this motion or notice for Defendant's visitation upon release and the same may be served upon her counsel, Scott Smith at Taylor Law Partners, P.O. Box 8310, E. Millsap Road, Fayetteville, AR 72703.

Soon after Randell's October 2018 incarceration, Sheena and MC, with the assistance of Randell's parents, moved from Texas to Greenwood, Arkansas, where Sheena's family resides. Sheena married Jesse on February 10, 2020. They have lived together with MC in Fayetteville, Arkansas, since their marriage. On March 4, 2022, Sheena and Jesse filed a stepparent-adoption petition asking that Jesse be permitted to adopt MC and alleging that Randell's consent to the adoption was not required under Arkansas Code Annotated section 9-9-207(a).[4]

The circuit court held a hearing on the adoption petition and considered the testimony of the parties—Sheena, Jesse, and Randell—as well as Angela Strozier, family friend; Lisa Howard, Sheena's mother; Sue Shelton, Randell's mother; and Randell Shelton, Sr., Randell's father. Following the hearing, on the basis of the testimony of the parties and witnesses and evidence entered into the record, and noting the best interest of MC, the circuit court granted the petition. In so granting, the court found

---

[4](Repl. 2020).

that Randell's consent to the adoption was not required because for a period of at least one year he had failed significantly without justifiable cause to communicate with MC pursuant to Arkansas Code Annotated section 9-9-207(a)(2)(i). This appeal followed.

On appeal, Randell first argues that the circuit court erred in finding that his consent to the adoption was not required. Adoption statutes are strictly construed, and a person wishing to adopt a child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence.[5] A circuit court's finding that consent is unnecessary due to a failure to support or communicate with the child will not be reversed unless clearly erroneous.[6] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[7]

Consent to adoption is not required of a parent of a child in the custody of another if the parent for a period of at least one year has failed significantly without justifiable cause to communicate with the child or to provide for the care and support of the child as required by law or judicial decree.[8] It is not required that a parent fail "totally" in these obligations in order to fail "significantly" within the meaning

---

[5]*Id.*

[6]*Id.*

[7]*Id.*

[8]*Courtney v. Ward*, 2012 Ark. App. 148, 391 S.W.3d 686 (citing Ark. Code Ann. § 9-9-207(a)(2)(i) & (ii) (Repl. 2009)).

of the statutes.[9] It denotes a failure that is meaningful or important.[10] "Without justifiable cause" signifies a failure that is voluntary, willful, arbitrary, and without adequate excuse.[11]

Randell and Sheena divorced in February 2020. In March, after the parties' divorce was granted, Randell directed his attorney to send a letter to Sheena's attorney requesting photos of MC. In May, after receiving no response, Randell directed his attorney to send a follow-up letter. These letters, though they concerned MC, were not sent to Sheena directly. She denied having received the letters. They were both sent to Scott Smith, the attorney who represented her in the divorce proceedings. Sheena testified that following divorce, Smith was no longer her attorney, except for the limited purpose of accepting communication regarding Randell's visitation with MC. Neither of the letters was a request for visitation. Randell admits that he attempted no communication whatsoever with Sheena or MC after the March and May 2020 letters to her former counsel. The adoption petition was filed in March 2022. This is a one-year period—a nearly two-year period—of no communication with MC. Randell admits that he did not communicate or attempt to communicate with MC or communicate with Sheena regarding MC during that two-year time frame. There is no dispute that Randell failed to communicate with MC for a period of at least one year.

The issue then becomes whether Randell failed significantly without justifiable cause to communicate with MC. Even with the undisputed lack of communication, Randell contends that his failure to communicate was justifiable because of the divorce decree's provision for visitation upon his release from prison. He argues that he relied on the visitation guarantee in the decree, and because he

---

[9]*Fox v. Nagle*, 2011 Ark. App. 178, at 4, 381 S.W.3d 900, 902.

[10]*Id.*

[11]*In re Adoption of K.F.H. & K.F.H.*, 311 Ark. 416, 421, 844 S.W.2d 343, 346 (1993).

was still in custody under home-confinement status, the provision entitling him to visitation was not yet triggered, and the adoption petition was filed prematurely. Moreover, Randell asserts that nothing in the divorce decree allowed visitation with MC while he was incarcerated; therefore, his failure to communicate was justifiable, and his consent for the adoption was required. Randell argues that "a natural parent should not be punished relying on a court order and place a parent at the risk of losing their parental rights under the adoption statute."

First, we agree with appellees' contention that Randell wholly mischaracterizes the decree's visitation provision on which he relies so heavily. The provision that Randell directs this court's attention to does not guarantee or provide automatic visitation with MC upon Randell's release from incarceration. Instead, it outlines the process by which Randell may request and/or petition for visitation once he is released.

Second, to the extent that Randell argues the decree's visitation provision served to excuse him from his parental obligation to communicate with MC throughout his incarceration, we are unpersuaded. Communication and visitation are not one and the same. The terms are not synonymous and interchangeable. The allowance or disallowance of one does not equate to an allowance or disallowance of the other. The plain language of the divorce decree demonstrates there was no prohibition on contact or communication. We decline to insert a restriction into the decree where there is none. Accordingly, we find that Sheena and Randell's divorce decree provides no justifiable cause for Randell's failure to communicate with MC for a period of more than one year.

When reviewing a finding that consent is not required pursuant to Arkansas Code Annotated section 9-9-207(a)(2), "we must consider whether the parent has utilized those resources at his or her

command . . . in continuing a close relationship with the child."[12]  Randell testified that while in prison, he had access to resources such as mail, phone, and internet.  He specifically testified that he had to pay for phone use prior to the COVID-19 pandemic, but once the pandemic began, phone use was provided free of charge.  Yet Randell admitted that he never called Sheena.  When questioned, Randell conceded that the divorce decree did not prohibit him from contacting Sheena to check on MC, nor did it prohibit him from sending MC birthday cards or gifts.  Despite this acknowledgment, Randell testified that after the parties' divorce in February 2020, he made no attempt to directly communicate with Sheena.[13]  On this record, we agree with the circuit court's finding that Randell failed to establish justifiable cause for his lack of communication with MC.

Randell also contends that his failure to communicate with MC was thwarted by Sheena.  He argues that Sheena directed him to stop contacting her, so he did as she requested.  Sheena testified that when Randell initially went to prison, she received communications from him, but the content of the communication did not involve MC; instead, it was flirtatious in nature. Sheena admits that she requested that Randell not contact her "on one occasion."  She stated that she sent a single email to Randell asking that he refrain from contacting her.   Sheena reasoned that at the time of the request, the divorce was pending, and they were both represented by counsel "and any communication could have gone through our attorneys."  However, importantly, once the parties' divorce was final, there was no prohibition in the decree or from Sheena directing Randell to refrain from communication regarding MC.

---

[12]*Reid v. Frazee*, 72 Ark. App. 474, 480, 41 S.W.3d 397, 401 (2001) (quoting *In re Adoption of Titsworth*, 11 Ark. App. 197, 201, 669 S.W.2d 8, 10 (1984)).

[13]Randell testified that in May or June 2020, he directed his attorney to send a letter to Sheena's attorney requesting photos of MC as well as information concerning MC's address and medical records, but he never received any information and made no effort to communicate regarding MC after that time.

Sheena acknowledged that Randell sent text messages to her on cell phones smuggled into the prison facility. In response, Sheena requested "that the prison not allow Randell to continue contact with her by his use of any smuggled and shared jail phones." Sheena did not ask that all contact be prohibited, only contact via illegal means. Notwithstanding that request, Randell still had other avenues for communication, such as email and phone privileges provided through the prison. Yet, he did not take advantage of either in an effort to communicate with MC.

Randell additionally argues that Sheena moved from Greenwood, Arkansas, but did not provide him with her new address. Despite Randell's urging, we decline to find that this amounts to justifiable cause for his lack of communication with MC. Sheena testified that while she did move, her cell phone number remained the same since 2009. Randell admitted that he did not attempt to call Sheena on her cell phone. Likewise, Sheena's email address remained the same. Randell failed to utilize the resources at his disposal to communicate with MC; physical address is but one method. There is inadequate evidence to support Randell's argument that Sheena thwarted his ability to communicate sufficient to justify his lack of communication with MC such that his consent to the adoption was required.

For his last argument on appeal, Randell contends that "even if consent is proven unnecessary" the circuit court erred in finding that the adoption was in MC's best interest. In support of his brief best-interest argument, Randell points to his testimony and that of his parents to demonstrate that he and his family desired to "care, support, nurture, and treat [MC] as family." Randell testified that he wants what is best for MC and wants to be part of her life. Randall's parents provided testimony that they also desired to be in MC's life. In considering best interest, we cannot ignore that since Randell's incarceration in 2018, he and his family took little to no initiative to build a bond with MC or to be involved, directly or indirectly, in her life. They did not inquire as to MC's well-being. Randell's parents testified that they were last in contact with MC in November 2018 when they aided Sheena in her move

7

from Texas to Arkansas.  They testified that they sent MC a package for Christmas in 2018 but did not receive a response or acknowledgement and had not made any further attempts to maintain a relationship with MC since then.  Likewise, Randell also failed to take any steps to create or preserve a bond with MC.  MC was two months old the last time Randell saw her.  Because of his failure to keep in contact with her, he is effectively a stranger to MC, who was four and a half years old when the adoption hearing was held.  Meanwhile, since Jesse married Sheena in February 2020, he assumed the responsibilities of providing for MC emotionally and financially.  In Randell's complete absence, Jesse willingly undertook the role as MC's father. We find no error in the circuit court's finding that MC's adoption by the only father figure she has known is in her best interest.

We find that Randell's consent to the adoption of MC was not required because Randell failed without justifiable cause to communicate with MC for a one-year period, and the adoption was in MC's best interest. Accordingly, we affirm the circuit court's order granting the stepparent adoption.

Affirmed.

GLADWIN, KLAPPENBACH, and GRUBER, JJ., agree.

BARRETT and HIXSON, JJ., dissent.

**KENNETH S. HIXSON, Judge, dissenting**. Let's cut to the chase:  How does an incarcerated father communicate with a two-month-old infant, then toddler, when the mother forbids the father from calling and moves from Texas, to Greenwood, to Bentonville, to Bella Vista, and finally to Fayetteville without providing the addresses to the father?

The pivotal issue in this appeal is whether the father, Randell Shelton, Jr. (hereinafter "father"), for a period of one year failed significantly *without justifiable cause* to communicate with his child pursuant to Ark. Code Ann. § 9-9-207(a)(2)(i) (Repl. 2020).  The mother, Sheena Shelton, now Reid (hereinafter "mother"), did not plead any alternative ground for adoption.  The trial court found that the father's

consent to the adoption was not required based on this statutory provision and granted the adoption. I would hold that the trial court clearly erred because under the largely undisputed circumstances presented, the father did have justifiable cause for his failure to communicate. Therefore, I respectfully dissent from the majority's decision to affirm the adoption.

The record shows that the father became incarcerated in a federal detention facility in Texas in October 2018 when the minor child (MC) was just two months old. During the early stages of his incarceration, the father had access to "illegal" cell phones and would text the mother. The mother contacted the federal prison administrators and asked them to take whatever steps were necessary to prevent the father from contacting her through the use of "illegal" cell phones. In February 2019 the mother sent the father an email asking him not to contact her. The mother testified at trial, "And then one time I asked him, you know, please don't contact me, but we had attorneys at that point in time. So, we were both represented, and any communication could have gone through our attorneys." After she asked the father to stop contacting her, she never told anyone that it was okay for the father to start contacting her again. In November 2019, while the parties' divorce was still pending, the father sent the mother this email:[1]

> Sheena, *I know you told me not to contact you anymore*, which I have honored, but after hearing from my attorney about the steps you're taking in the divorce and that you're apparently trying to cut me out of [MC]'s life forever, I cannot be silent—I beg you, please do not do this to [MC] and me. I am heartbroken to hear of the untrue things you have said about me. I'm also heartbroken that you have refused to provide my attorney with basic information about [MC]. Please, I beg you, send current pictures of [MC] and tell me how she's doing. I don't know if [MC] is walking, has she started to talk, have you been taking care of her, is she healthy? I don't even know what my own daughter looks like. It has been beyond heartbreaking to know that I'm missing so many firsts in her life and on top of that I'm being kept from seeing her and knowing about her. . . . She is my daughter too. I love her with all my heart. I held her when she was born, just like you did, it was the happiest & proudest day of my life. Missing her is a pain you can't begin to

---

[1]The father did not receive a response to this email, and at trial, the mother denied receiving it.

9

imagine.  Please send me pictures and updates until the day I'm back holding my precious angel in my arms.

(Emphasis added.)

In February 2020, the mother was granted a divorce, at which time MC was eighteen months old.  Paragraph 4 of the divorce decree provides in relevant part:

The [father] is currently incarcerated. . . .  Upon the [father] being released from prison . . . the [father] *shall* be entitled to provide the [mother] with notice that he is requesting visitation and if the parties cannot agree as to a visitation schedule, then either party *shall* have a right to request a hearing before the court.

(Emphasis added).  On the same day the divorce decree was entered, the mother also dismissed her previously filed petition for single-person adoption.

A month after the divorce was granted and visitation deferred per the decree, on March 10, 2020, per the mother's prior instructions, the father asked his attorney to write the mother's attorney a letter.  The letter provides in pertinent part:

My client in the above referenced matter is assuming that your client prefers not to hear directly from him.  If that is a misunderstanding please let me know.  But in the meantime he asked me to convey this message to her via you.  He would like to request some pictures of the child.  Anything your client would be willing to share she may feel free to forward to me via email at [father's attorney's email address] or to send through you.  I would appreciate this kind consideration.

The father did not receive a response to this email.[2]

Two months later, on May 13, 2020, after not receiving any response from the March 10 letter, and again per the mother's prior instructions, the father's attorney sent a follow-up letter to the mother's attorney:

Please accept this inquiry regarding the above captioned matter.  If you would prefer that I communicate directly with your client regarding issues such as those raised in this letter, please let me know and I will send correspondence directly to her.

---

[2]Again, at trial, the mother denied receiving the email.

10

I have maintained communication with my client, Randell Shelton, since the Decree of Divorce was entered. I told him that I would communicate with you or your client rather than him reaching out to her directly. I did so on the assumption that she would prefer to minimize communication with him. Again, if she prefers for him to communicate directly with her let me know and I will have him email her directly. I would just need a current address.

My questions to her are as follows:

1. Have there been any medical records produced regarding the child since the entry of the Decree of Divorce?
2. Where is the child currently residing and with whom?

3. In our last conversation before the entry of the Decree we discussed that you would talk to her about whether she would be willing to provide a photograph of the child. My client is requesting that she please do so by forwarding it to my office and I will get it to him.

Thank you for your time and attention.

Neither the father nor his attorney received a response to this letter.

In the meantime, the mother moved several times. In the fall of 2018, the mother moved from the marital home in Texas to Greenwood, Arkansas. The father's parents assisted in the move. In the summer of 2019, the mother moved to Bentonville. In February 2020, the mother moved to Bella Vista. And in October 2020, she moved to Fayetteville. On cross-examination, the mother was asked whether she had provided any of these addresses to the incarcerated father since the summer of 2019, and the mother testified that she did not.

The mother and her new husband filed a petition for adoption on March 4, 2022. The first communication the father received from the mother after the February 2020 divorce was when the father was served process for the adoption of his daughter, and on June 15, 2022, the father filed a response to the petition asking that it be denied.

One week after the father filed his answer to the petition for adoption, his attorney wrote a letter to the mother's new attorney and sent a copy to the mother's previous attorney. This letter stated:

11

My client has asked me to reach out about establishing some sort of visitation with the minor child. The Decree required notice to be provided to [mother's previous attorney] who I have copied on this letter. I know your client has filed a petition for adoption so I'm guessing she is not interested in establishing visitation. Please let me know either way. In the event she is agreeable, I would suggest that we begin with video visitation beginning on a weekly basis and then moving to two or three times per week until in-person visits begin. Thank you for your time and consideration.

After the hearing on the mother's adoption petition, in which the father appeared from Texas via Zoom, the trial court found that that the father's consent to the adoption was not required because the father for a period of one year failed significantly without justifiable cause to communicate with his child. The trial court did not specify which one-year period was proved.

The narrow issue in this case is this: how can an incarcerated father *communicate* with a two-month-old infant, then toddler, when the mother directs him not to contact her and he does not know of the mother's various subsequent addresses? An even more elementary question is *how does any person "communicate" with a two-month-old infant or toddler by telephone from a thousand miles away*? The Merriam-Webster Dictionary defines communicate as "to convey knowledge of or information about; make known."[3]

In my opinion, the sequence of events described above demonstrates justifiable cause for the father's failure to communicate with MC, an infant and then toddler. Not only did the mother advise the father to refrain from calling and failed to provide the father any of her three new addresses, the divorce decree provided that "[u]pon the [father] being released from prison . . . the [father] *shall* be entitled to provide the [mother] with notice that he is requesting visitation and if the parties cannot agree as to a visitation schedule, then either party *shall* have a right to request a hearing before the court."

---

[3]*Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/communicate. Accessed Mar. 11, 2024.

Therefore, the father's consent to the adoption should have been required, and the trial court clearly erred in finding otherwise. Accordingly, I would reverse the adoption.[4]

BARRETT, J., joins in this dissent.

*Tschiemer Legal Briefing*, by: *Robert S. Tschiemer*, for appellant.

*Jane Watson Sexton*, for appellees.

---

[4]I make no comment on whether the adoption would be in the child's best interest.