Cite as 2024 Ark. App. 280

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-23-311

| | |
|---|---|
| JUAN FERNANDEZ AND ELISE HARO<br>APPELLANTS<br><br>V.<br><br>STEVE SERRANO<br>APPELLEE | Opinion Delivered April 24, 2024<br><br>APPEAL FROM THE BENTON COUNTY CIRCUIT COURT<br>[NOS. 04DR-21-1847, 04PR-21-1301]<br><br>HONORABLE JOHN R. SCOTT, JUDGE<br><br>AFFIRMED |

## MIKE MURPHY, Judge

Appellants Juan Fernandez and Elise Haro appeal the decision of the Benton County Circuit Court denying Fernandez's petition to adopt his thirteen-year-old stepdaughter, MC, Haro's child. Steve Serrano, the appellee, is MC's biological father and contested the adoption. On appeal, the appellants argue that the circuit court erred in finding that adoption was not in MC's best interest. We affirm.

### I. *Facts*

The immediate litigation began in November 2021 when Serrano filed a petition seeking to establish paternity and visitation with MC. One month later, Fernandez filed a petition to adopt MC. The two cases were consolidated, and a hearing was held over three days in July 2022.

The circuit court heard the following evidence at the hearing. MC testified first. The hearing took place during summer break; she attended a private school and was a rising ninth grader. She lives with her mother, Fernandez, and two siblings. She has decent grades, a lot of friends, and enjoys extracurricular activities like cheer and volleyball. Before moving to Bentonville, she lived with her family at a religious training camp in Ozark, Arkansas, and in California before that.

MC explained that she has a good relationship with Fernandez. She enjoys spending time with him. He is kind, "the funniest," and "very smart." He runs her to practices, he helps with her homework, and she said that he loves her mom a lot. She testified that she really wants to get adopted. "[T]o be officially adopted would just be . . . kind of like the icing on the cake because he is my dad."

MC testified that she does not have any relationship with Serrano. She does not want a relationship with Serrano. She recalls meeting him once, maybe twice. She explained this is because she already has a father in Fernandez and does not want anyone replacing him. MC said she knew Serrano had never tried to have a relationship with her because that is what her mom had told her. She is opposed to even having contact with Serrano: "I've already not had contact with him, any, and I've been doing just fine without him."

Two witnesses testified on behalf of Fernandez. Their testimony was consistent that MC and Fernandez have a great relationship. One of the witnesses—an attorney and close friend of the family—testified that she knew Serrano paid child support, and that was how

Fernandez and Haro were able to pay MC's private-school tuition. Another witness—one of MC's teachers—testified that MC is very bright.

Elise Haro testified. She had met Serrano online in 2007. They both lived in California. She explained that on the night she got pregnant with MC, she had invited Serrano to her house, and he had raped her. She told Serrano she was pregnant, but Serrano did not see MC until she was about six. She testified that Serrano has sent a few gifts over the years and paid child support. Emails were introduced that showed the two of them communicated cordially and regularly from about 2011–2015. The last email in that chain that was introduced was from March 2015, and it was sent by Serrano. In that email, Serrano thanked Haro for visiting him at work and gave her his updated address.

Haro testified that she met Fernandez in 2015, the year the email exchanges with Serrano stopped. Haro and Fernandez were married just over a year later. They moved from California to Ozark, Arkansas, in 2015 and then later to Bentonville. In 2016, Haro wrote a book titled *Someway Somehow: Rape, Redemption and Radical Hope*. There was a Kickstarter (a type of fundraiser) for the book, and for a $250 pledge, Haro and MC would send a backer a personalized video message of thanks.

Haro admitted she had told MC that Serrano had raped her, but Haro did not think this would affect MC's opinion of Serrano. She told MC about the rape when MC was "old enough to know what sex was." She said she told MC that she was a child of rape because "it makes her extra special." Haro said that she had concerns with Serrano being around MC because Serrano had raped her, but it was also true she had friendly exchanges with Serrano

3

for several years, let MC meet Serrano on a few occasions, and stopped regularly returning his emails around the same time she met Fernandez.

Serrano reached out again in February 2021; he emailed Haro at the same email address he had used previously. MC was twelve. In the 2021 email, Serrano asked if they could come to an agreement about his being a part of MC's life. Haro testified that she "absolutely" withheld information from Serrano, and she did not tell him when they moved to Arkansas. Fernandez filed the petition for adoption in response to Serrano's petition for visitation.

Fernandez testified. His testimony was consistent with the other witnesses about his relationship with MC. They love taking drives, listening to music, and going to the movies together. He wants to be her legal father. He said no matter what happens with the trial's outcome, he will still care for her like he always has. Fernandez thinks MC is raised well but having "another parent" involved would cause her to be "raised differently." He thinks Serrano would be a bad influence on MC because Serrano raped Haro.

Serrano testified. Haro did not tell him about MC until 2009 when MC was two. He testified that he saw Haro and MC on multiple occasions from 2014 to 2015. They lived nearby, and they would meet for walks around Target, bowling, Chuck E. Cheese, or dinner at a restaurant near Haro's home. Around this time, there was less need to email because he and Haro would call and text, but Haro quit responding to Serrano's calls and texts in 2015. He did not reach out again via email. For three years, he tried to locate Haro and MC. He went to legal clinics, hired skip tracers, and hired a private investigator. Even before 2015,

4

he did not know that getting visitation "would be a fight"; he thought he "had to prove himself" to Haro.

In 2019, Serrano received a letter from an Arkansas government agency stating that Haro was trying to set up government assistance. Serrano moved his location efforts from California to Arkansas, hired an Arkansas attorney, and moved forward with pursuing visitation with his daughter. Serrano has no intention of getting in between MC and Fernandez; he thinks Fernandez is a great stepfather, but Serrano wants to have a relationship with his daughter. He asked that the court deny the petition for adoption. He testified that MC could have a great dad and a great stepdad. He wants to help financially as MC gets older; "[S]he's getting into high school. I'm sure that additional financial help for big epochs in her life will be needed. You know, I, obviously, have an additional resource in California, additional home, additional family, who loves her and does not even know her."

Serrano is 37, works as a broadcast engineer for FOX and seasonally for Major League Baseball. He has carried insurance on MC since 2011. He said the night MC was conceived, he was invited to Haro's apartment. He said he did not rape Haro. He said he was questioned but never charged with or arrested for rape. He knows that MC is almost fourteen, she has her own opinions, and it might be difficult to establish visitation, but he would be open to anything the court ordered to allow them to connect, including family counseling.

The ad litem provided his opinion to the court. He explained that he could not make a formal recommendation for or against the adoption. He said that MC is thriving in the environment she is in, with a loving mother and stepfather, and on its face, the adoption

5

should be granted. But, the ad litem explained, Serrano had made continuous—not great, but continuous—efforts to see MC since finding out about her, and he believed MC's lack of a desire to get to know Serrano has been shaped by what she was told growing up.

After taking the case under advisement, the court announced the following findings from the bench. It found that Serrano did not communicate with MC for almost seven years, and that failure was without justifiable cause. But regarding the best-interest finding, it found that granting the adoption was not in MC's best interest. The court found that the communication between Haro and Serrano for several years was inconsistent with Haro's rape allegations. It further found that it was shocking Haro told MC that MC was conceived because of rape and that it was equally outrageous that Haro believed this did not affect MC's attitude toward Serrano. The court believed Fernandez's testimony that a denial of the adoption petition would not change his close relationship with MC. The court said that, after a full and accurate evaluation of the circumstances, it would not be in MC's best interest to grant the adoption. It further awarded Serrano visitation, to be established as the parties agreed or by court order at a later date.

On appeal, Fernandez and Haro argue that the circuit court erred in finding that the adoption was not in MC's best interest.

II. *Standard of Review*

We review the record of an adoption proceeding de novo. *Ducharme v. Gregory*, 2014 Ark. App. 268, at 6, 435 S.W.3d 14, 18. Generally, consent to an adoption is required by the father of the minor child to be adopted. Ark. Code Ann. § 9-9-206(a)(2) (Repl. 2020).

6

Under certain circumstances, however, the consent of the father may not be required. Arkansas Code Annotated section 9-9-207(a)(2)(i) & (ii) provides that consent to adoption is not required of a parent of a child in the custody of another if the parent, for a period of at least one year, has failed significantly without justifiable cause to communicate with the child or to provide for the care and support of the child as required by law or judicial decree. However, the mere fact that a parent has forfeited the right to have his consent to an adoption required does not mean that the adoption must be granted—the court must further find by clear and convincing evidence that the adoption is in the best interest of the child. *Waldrip v. Davis*, 40 Ark. App. 25, 26, 842 S.W.2d 49, 50 (1992).

Here, the finding regarding consent is not disputed. The circuit court found that Serrano's consent to the adoption was not required because he had failed without justifiable cause to communicate with MC for over a year.

Nonetheless, it found that the adoption was not in MC's best interest. Concerning best interest, specifically, we will not reverse a circuit court's decision unless it is clearly erroneous or against the preponderance of the evidence. *Ballard v. Howard*, 2018 Ark. App. 479, at 4–5, 560 S.W.3d 800, 802–03. We have said that in cases involving minor children, a heavier burden is cast upon the circuit court to utilize to the fullest extent all its power of perception in evaluating the witnesses, their testimony, and the child's best interest; that the appellate court has no such opportunity; and that we know of no case in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as one involving minor children. *Ducharme, supra.*

III. *Discussion*

The appellants begin their argument by explaining that the circuit court's best-interest analysis fails to consider the evidence that demonstrates the adoption is in MC's best interest. This argument asks us to reweigh the evidence.

It is true that the circuit court's recited findings regarding best interest are sparse. But the circuit court also explained that it considered all of the circumstances. Furthermore, our de novo review allows us a complete review of the record and evidence to determine whether the circuit court clearly erred in either making a finding of fact or in failing to do so. *See Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009). We presume that the circuit court acted properly and made such findings of fact as were necessary to support its judgment. *Holmes v. Jones*, 2022 Ark. App. 517, at 2, 658 S.W.3d 462, 464.

Therefore, while the findings of the circuit court may have been limited to its conclusion that it did not find Haro's rape allegations credible, disclosing those allegations to MC negatively affected MC's opinion of Serrano, and that denial of the adoption would not change Fernandez's relationship with MC, when opening the entire case for review, we hold that there was ample evidence presented that could have additionally supported the finding that denial of the adoption was in MC's best interest. *See Hamilton v. Barrett*, 337 Ark. 460, 466, 989 S.W.2d 520, 523 (1999) (stating that "[w]here the chancellor fails to make findings of fact about a change in circumstances, this court, under its *de novo* review, may nonetheless conclude that there was sufficient evidence from which a chancellor *could* have found a change in circumstances").

The following additional evidence from the record supports the circuit court's finding that the adoption is not in MC's best interest. To begin, the record demonstrates that Haro thwarted Serrano's relationship with MC from the outset; Haro did not even tell Serrano about MC for the first two years of MC's life. Second, Serrano has regularly paid child support, was current on that payment, and has carried insurance on MC since 2011. Haro testified that the child-support payments allowed MC to attend what the record demonstrated is an academically rigorous private school. Third, Serrano's testimony established that he was willing to accept any form of a relationship with MC that might be tenable, which shows the depth of his understanding of their unique circumstances.

Furthermore, the facts here are similar to those in *In re Adoption of LZ*, 2021 Ark. App. 63, at 2, 616 S.W.3d 695, 696. In *LZ*, as here, there was evidence that the mother did not initially tell the father about the child and took steps to limit the father's ability to develop a relationship with his child—to establish visitation, the father had to agree to the mother's terms. Here, Haro moved across the country and then told MC that she was conceived by rape. And in *LZ*, we acknowledged how important it was that the circuit court clearly recognized the *potential* for a positive relationship between a father and his child. And the evidence supports the same here. By not granting the adoption and strongly emphasizing in its findings what efforts Serrano did take to see MC and what steps Haro took to prevent that, the court tacitly recognized a potential for a positive relationship between Serrano and MC if given the opportunity.

IV. *Conclusion*

9

Adoption proceedings are in derogation of the natural rights of parents, and statutes permitting such are to be construed in a light favoring continuation of the rights of natural parents. *Ducharme*, 2014 Ark. App. 268, at 6, 435 S.W.3d at 18. Given Serrano's consistent support that Haro testified contributed to MC's well-being, Haro's actions in preventing a relationship between Serrano and MC, and Serrano's readiness to develop a relationship with MC in whatever form that it may take, we are not left with a firm conviction that a mistake has been made. *See In re Adoption of T.A.D.*, 2019 Ark. App. 510, at 6, 588 S.W.3d 858, 862.

Affirmed.

ABRAMSON and THYER, JJ., agree.

*Graves Law Firm*, by: *Josie N. Graves*, for appellants.

*Matthews, Campbell, Rhoads, McClure & Thompson, P.A.*, by: *Sarah L. Waddoups* and *Edwin N. McClure*, for appellee.